Good morning. May it please the court, Howard Ratner representing defendant-appellant Skeins. I'm going to address issues regarding the instructions and the jury question. My co-counsel, Marian Royal, will address the issues of prosecutorial misconduct. She would like three minutes for her argument, and we'd like to reserve two minutes for rebuttal. I see. We'll try and keep track of that. All right. Thank you. The instructions are confusing in several ways. The first is the conspiracy instruction omitted the element of a specific intent. It basically said that the defendant became a member of the conspiracy knowing one of the objects and intending to accomplish it, rather than saying... Isn't that the intent, knowing? Knowing what? What is the object? And that's the problem, because if it said knowing that the object was to commit bank fraud, it would have been very simple. Was the jury provided with a copy of the indictment? It was. Okay. And the indictment, I presume, I don't have it in front of me, but I presume the indictment listed the objects of the conspiracy? It did, but the way the indictment listed them was a little broader than that. And, of course, the indictment doesn't say specific intent. Well, I understand that, but it does say knowingly, which is the mental element. Correct. And if the jury had the indictment before it, which listed the object of the conspiracy, and then presumably you all argued in closing to the jury all about the facts that the jury had heard, how could the jury have understood anything but that the object of the conspiracy was to defraud? Because I think what happened is the jury confused the acts themselves, whether it's preparing a title report or preparing an appraisal, with the object of the conspiracy, which is to commit bank fraud. And you can tell that from their questions. But wasn't the evidence all related to the obtaining of the loan from the Atlanta lender and the acts that you speak of, the false appraisal and so on, were all basically directed at duping the lender into parting with the money? That's correct. And the defendants basically admitted that those acts took place. The question was whether they knew that the acts were illegal, whether they intended to defraud the bank. Did my client, for instance, know that he was submitting a false title report, or was he just negligent? Well, I mean, the jury heard evidence that he created a phony title company, which did not, in fact, have any reinsurance to pay a claim. That's pretty strong evidence of contempt. Well, as far as my client goes, he thought, and he testified to this, that the title company was legitimate. I understand that, because he was relying on the representation that Mr. Hawkins made to him. Correct. So as to him, I don't think that would apply. Other than the fact that we have admissions from him that for $35,000, he relied entirely on what Mr. Hawkins told him and did virtually no research himself. Well, he was doing – our position was that not only did he do the title report, he did other things for Mr. Hawkins. For instance, he traveled to Florida to look at another company and advised him. He was calling – Hawkins was calling schemes almost every day. The jury heard the evidence that he essentially gave an attorney's opinion on the validity of the title in the form of a letter for $35,000, right? That's not how we would interpret what he did for the $35,000, but they did – As you know, I've got to look at the evidence in the light most favorable to supporting the verdict. So I'm going to – I can't draw those inferences in favor of your client for purpose. Then why would the jury ask the question, do members of the conspiracy have to know that the act is unlawful in order to be found guilty of the conspiracy to commit wire fraud? And secondly, does the government have the burden of proving that the defendants knew that the acts were unlawful? And this ties into the diminished capacity instruction. The district court seemed to suggest that by virtue of the fact that the jury returned a verdict before those questions were ever answered, that it must have resolved the questions to the jury's satisfaction. Well, it resolved the questions. The problem is, did it resolve them using an unconstitutional burden – I mean, unconstitutional grounds or legal grounds? And we just don't know because of those questions. And that's the gravamen of the problem here. When you look at all the instructions, the diminished capacity instruction, it's not clear who has the burden regarding proving specific intent from diminished capacity. Suppose that the court had had the time to answer the question, had called you all together, as I guess he eventually did. Correct. But by the time everyone was gathered, the jury had already returned a verdict, reached a verdict. Suppose that he had simply said, go back and reread the jury instructions, which is not an uncommon response to this kind of a question. Would you still have the same argument? I don't think that that would have been abuse of discretion. I think the judge had the obligation, if the instructions are not clear, if they omit an element, and it's clear that specific intent is an element of the crime of conspiracy. He reversed the pattern Ninth Circuit instructions, did he not, on conspiracy? He did. And that would be fine in a case like a drug case where there's no specific intent. But when there is specific intent, that has to be included. Somehow the jury has to be told that. Specific intent is included in the substantive instruction on wire fraud, isn't it? It is. But we look at the instructions as a whole, and if the answers to my earlier questions to you were, the whole case was tried on a theory of a scheme to defraud the lender, where is the constitutional violation here? I'm just not seeing it. Okay. When you go back and you look at the wire fraud instruction, first of all, it's the second and third counts. So they probably would have addressed the conspiracy first. If they concluded that they had the specific intent to defraud, why would they ask the question regarding do they have to find that the defendants knew it? So I think what happened is it's broad. The confusion to the jury and the way the instructions were read goes across all the instructions. There's another instruction also that also plays into the confusion, and that's instruction 20, which defines intent. Intent is to deceive or cheat. You may determine if the defendant had a good faith belief in the truth of the specific misrepresentations to determine if the defendant acted with intent. And it seems to me the jury's questions go exactly to that, that they were wondering whether or not the defendants knew that these misrepresentations were incorrect. And if they didn't know they were incorrect, they couldn't find specific intent either for conspiracy or for the wire fraud. And that's where we — that's why it's kind of — Could the jury, under your view of the law, could the jury have convicted Mr. Skines by finding that he engaged in willful ignorance, that in essence he adopted sort of an ostrich approach? He signed the letter verifying the title for a significant amount of money without doing much in the way of any legal research, in essence almost willful ignorance. There wasn't a willful ignorance instruction, and therefore I don't think they could have done that. So under the instructions as the jury got them, they could not find that. But why couldn't they find, even in the absence of an instruction, why couldn't they look at that evidence and decide that he must have known that something was amiss by virtue of what he did and failed to do? They probably could have done that. That's correct. I mean, I don't know why they — because then they would basically be finding that he had the intent. That's what I'm saying. Because he would have known. But all that evidence is in the record. And if I view that evidence in the light most favorable, then if you were challenging a sufficiency of the evidence, if that was the issue before us, I think you'd have to lose under Jackson because that evidence was all before the jury. Oh, I think that's correct on sufficiency. But here we're talking about an issue of burden of proof and whether the diminished capacity of defense, the jury thought that it shifted the burden of proof from the government to the defense so that the defense would have to prove that the defendants didn't have specific intent. Well, the defense of diminished capacity is an affirmative defense, right? It's actually not an affirmative defense. It's a defense but not — Sort of a mitigating — A mitigating defense. It's correct, yes. Yeah. Mr. Henry, did you want to say something? Yeah, if so. Yes. Thank you. Ms. Rothman. May it please the Court. Mary Ann Royal appearing on behalf of Mr. Hawkins. As co-counsel already stated, I will be focusing primarily today on the two issues raised by the prosecutor's rebuttal argument. The first issue is the Fifth Amendment right to silence, and the second is the vouching. The Fifth Amendment right to silence, the government conceded the error as to the right to silence but claims it is not sufficient to establish plain error. However, under the three prompts of the test outlined in Cavuto, it does rise to that level. The first prompt is the extent of the comments, which in rebuttal approached approximately three pages. The second and the most important factor is the inference of silence from guilt. The prosecutor said, based on the defendant's silence, that the jury could basically convict him because he didn't answer the question. Well, he had answered the question before he invoked, didn't he, when he was being interviewed by the FBI agent? Not the specific question. It's the question that he did not answer related to the appraisal photograph. Yeah, how they got the interior. But hadn't he told the agent before he invoked that sometimes you have to get creative when the agent asked him, how did you get the interior? He did say that. He did. But then he got on the witness stand in his own defense, and he testified inconsistently by saying he had no idea how those photographs were obtained. No, because, excuse me, Your Honor, because it wasn't an answer to that question that he said he had to get creative. The specific question was, how did you get the interior photos? And he said, I will not answer that question. Well, where did the creative, I thought I read in the summary of the agency. That was the question before that about the appraisals in general. Why doesn't that relate as well to, I mean, the photographs are part of the appraisal report, are they not? That's correct. Okay, and then he testifies at trial that he has no idea how the appraiser got those photos. Why is that not inconsistent with what he told the agent and a proper ground for cross-examination based on prior inconsistent statements? Because he didn't answer the specific question of how he got the appraisals. He said, I will not answer that question. Okay, but he'd already said it. So it wasn't inconsistent with his trial testimony. I guess that's where you and I are seeing the testimony differently. I think that is impeaching. Also, I would say that the government did concede that the prosecutor's statement was in error. Accordingly, the inference of silence from guilt was argued to the jury in the other cases where the court has found it. Given the government's concession that it was wrong, it's really a question of whether it's harmful. That's correct. But there's a lot of evidence. There's a lot of evidence, but there's also a lot of diminished capacity evidence. All of the testimony regarding Mr. Hawkins was that he sincerely believed that what he was doing was a legitimate remedy for the debacle that he had gone through in the 80s when he had lost the building. Yeah, and that may be right. Obviously, the man has, in his own view of things, suffered grievously, and he was trying to get back. Now, of course, he was getting back at different people. That's correct. The people were not related to him. How did he target Judge Pekelas? That alluded to me. She was the appellate court judge in the appeal, I think, of the Latches decision, where they found that even though 11 jurors had come back after the 2020 program and said, we talked to the judge that just came in and told us this is what to do, and we thought we were giving you $3.5 million, and then that turned out to be denied on the basis of Latches, and that was appealed, and he lost that appeal. Okay. Did you have a second point? I'm sorry, but I don't want to make you sit down to save your time. If you had one more point you wanted to make before. The other point, briefly, Your Honor, is the vouching, which was harmful error, and that is basically briefed in my case. Yeah. No, we've got the voucher. Why don't we hear from the Governor, and we'll give you some time for rebuttal. Yeah. Good morning, Your Honors. May it please the Court. My name is Mike Morgan. I represent the Governor on this appeal. I'll begin with the challenge to the Court's instructions. Just preliminarily, if I understood counsel correctly, they're now arguing, at least in the oral presentation, that there was some problem with the diminished capacity instruction. This is the first that the Government is hearing about this. It was never briefed, not even in reply. But I would direct the Court to instruction number 22, which is excerpts of record, page 36, in which the Court specifically instructs the jurors, you may consider evidence of abnormal mental condition in deciding whether the Government has proved beyond a reasonable doubt that the defendant acted with the intent to commit wire fraud or conspiracy. So I'm at a loss to understand how this instruction somehow shifted the burden onto the defendant to prove his intent. With respect to the conspiracy instruction, this Court has already considered and rejected the exact argument the defendants are pressing, which is that in a conspiracy case, you must modify the model instruction and include a language specifying the defendants must intend to defraud. In the Smith case, which is cited in our briefs, the Court made clear that if you give the general conspiracy instruction, coupled with the substantive instruction, and as long as the substantive instruction is correct, that's sufficient to instruct the juries adequately that to find them guilty of conspiracy to commit wire fraud, they must have acted with the intent to commit wire fraud. And the instructions that were delivered in this case make that point perfectly clear because it was a single-object conspiracy, and the conspiracy instruction specifically says that the object is to commit wire fraud. There was no other object about which the jury could be confused about. So there's really nothing more I have to say, unless the Court has any questions about the substance of the instruction itself. As I understood Mr. Ratner's argument, the defense concern is that Mr. Skynes, by virtue of his own diminished capacity, and while admittedly he didn't do as much as he should have done as a lawyer before he rendered an opinion on the validity of the title, essentially placed his trust in Mr. Hawkins and had no reason to believe that Mr. Hawkins was engaged in anything illegal. Well, that would go, I suppose, to the sufficiency of the evidence. I'm not sure how that impacts on the adequacy of the conspiracy instruction itself. But with respect to that evidence, the fact of the matter is that his client came to him and said, there are two title chains. Anyone who's taken first to your property knows that's just not right. And for a lawyer to sort of say, okay, well, you say there's some second title chain under the UCC. I'm just going to blindly accept that. I would suggest that that is strong evidence of a fraudulent intent. But there's even more evidence here, where if you listen to the recordings of Skynes' communications to the lender, where he affirmatively represents that A, Hawkins does own these properties and B, that he is engaged in an exhaustive search to verify these title claims. Well, that's just a flat-out lie. And why is he – I mean, if he truly believed that his client's claims were valid, he would have researched them. He wouldn't have just made it up. And the jury heard that, and the jury also heard his explanation. So I don't think there's any question about the sufficiency of the evidence to support the intent element on either defendant. I think Mr. Ratner conceded that he wasn't challenging sufficiency. Yeah, that's not the argument. The argument is the instruction given the circumstances and the arguments in the case. And our position is that the instruction tended by the defense is not legally inaccurate, but the court's instruction was not legally inaccurate. And that being the case, the court could not have abused its discretion to deliver a legally accurate instruction. I have a question for you, and that is, even if you win on this one, and I'm not sure you will, but even if you win on this one, why did you give him this argument for appeal? I mean, you say his instruction was okay, too. Why didn't you just say fine? Well, I mean, that's a strategic – We've improved intent. We already have. Not a problem. That's a strategic choice, but the fact – Yes, I know. And I'm asking you why you made that strategic choice. I would opine that by including that element in the instruction, it actually gets confusing in the context of the conspiracy instruction itself. Because if you read the conspiracy instruction and you talk about the intent to affect the object, and then later on you talk about intent to defraud, you're talking about intent twice. I mean, I suppose what you could have done was fashioned it into – you could have fashioned the language as opposed to the instruction that was proffered, is fashioned the intent into the agreement to effectuate the object. There's some way you could have incorporated it into the instruction. I think, quite frankly, is that the government was relying on the model instruction, feeling that that's usually the safest way to go. Deviating from the model instruction is just a recipe for problems. Were you the trial attorney? I was not the trial attorney. No. Do we have anybody here who was the trial attorney? Yeah, okay. With respect to the court's response to the jury's question, the first point I have to observe is that we have no idea why the jury asked that question. There may have been a juror who was confused. Their verdict, of course, demonstrates conclusively that in the end of the day, they did find beyond a reasonable doubt that both defendants acted with the intent to defraud. They couldn't have convicted on the substantive wire fraud conspiracies had they not. Was the jury polled individually? The jury was polled individually. They all stood by their verdicts. So there's no – But, of course, what you're saying is presuming the propriety of the instruction. Presuming the propriety of the instruction. And that's the question to be decided. Yes. But with respect, Your Honor, this Court has already decided that question. But if the defense proffered instruction was an accurate statement of the law and the Ninth Circuit model jury instruction is an accurate statement of the law, then the question we have to ask is whether it was an abuse of discretion for the trial judge to reject the defense proffered instruction. I believe that's correct. And I believe the only way the trial judge could abuse its discretion in that circumstance – well, let me back up. I would argue that if given the choice between two legally correct instructions, a trial judge, as a matter of law, could never abuse its discretion. I think that's right. I think our case law says that you have to find that the instructions as given did not fairly and adequately explain the law to the jury. I do believe that's correct. And I also think it's important to note that regardless of the fact that the defense instruction was not given, nothing in the instructions that were given in any way impinged upon the defendant's ability to argue the theory of the case to the jury. So that being the case, there just simply could not have been an abuse of discretion in the Court's choice of instructions. With respect to the Court's response to the juror's question, the fact of the matter is is that by the time the Court was able to formulate a response, the jury had reached a verdict. So in that circumstance, it certainly could not have been an abuse of discretion to ask the jury to set aside its verdict, we're going to give you some more instruction, then go deliberate again. The jurors obviously figured out their problem. And that being the case, there was simply nothing for the Court to do. Unless the Court has any questions on that issue, I will finally turn to the prosecutorial misconduct issues that have been raised. The first issue I will address briefly, the vouching issue. I understand it's brief. Simply stated, I'm somewhat at a loss to understand how this is in fact vouching. Simply because the prosecutor described Kendrick's testimony regarding the underwriting and how that may or may not have impacted his evaluation of whether there was sufficient evidence to bring a charge against DePaula. I don't see how that vouches for the veracity of anyone's testimony. As I understood the testimony, Kendrick essentially said, which is not very helpful to the government's theory, well, we really don't care what the person says in the loan application because we're relying on the value of the real estate to secure the loan, not the representations by the borrower as to his net worth. Exactly. And of course, that being her testimony, that does in fact explain why you can see why the prosecutor would, to the extent that there was a question about the government's charging decision, well, if the borrower is just lying in the loan application about his income, his liquid assets, what have you, if that's irrelevant to the lender, because the lender is basically writing this loan because of the value of the property, well then how can those representations be material? I think Congress would be surprised when it enacted, what was it, 1014, that that is the state of the market, that lenders really don't care. I think this case is a cautionary tale about the state of the lending at the time that occurred, to be sure. As if we needed another one. Exactly. With respect to the prosecutor's comments on Mr. Hawkins' decision not to speak about how he somehow got these photographs into the appraisals, I think it is important to, as a threshold, just understand that as a matter of law, Hawkins never actually invoked his Miranda rights. He didn't want to talk about a single issue in a 50-minute conversation, and under this Court's precedence, that's not even enough to really trigger Miranda. And that being so, it was fair game for impeachment. It was certainly fair game in summation for the prosecutor to point out that, look, I understand you say you have no idea when you're talking to the agent, you say you had to get creative and then you don't want to talk about it, but why wouldn't you want to talk about it if you had no idea? That's a pretty innocuous explanation you would expect to be proffered. That's all okay. Yes, the prosecutor did go a little bit further, to be sure, but as the Court has recognized, there's a lot of other evidence in this case showing Mr. Hawkins' fraudulent intent, not the least of which is the fact that he's felt the need to employ a straw buyer to sell these properties. I mean, the natural question is, if he owned them, why is he putting in a middleman to sell these properties? So the fact that the prosecutor might have overstepped in that one instance is certainly not enough to rise to the level of plain error and there can be no question, reversible plain error, unless the Court has any other questions, the rest of my brief can ask that the judgment be affirmed. Thank you. You asked to save two minutes and here are your two minutes. Thank you, Your Honor. First of all, regarding the Smith case, it really is a different case because they didn't raise a diminished capacity defense there, so that wouldn't have raised the same issues as we have here. What's your response to Mr. Morgan's citation to ER 36, the jury instruction on evidence of abnormal mental condition? Well, the problem with that is it's the interplay between the two instructions, the conspiracy instruction not defining, not stating an element of specific intent, and the diminished capacity where it doesn't specifically say that, although it says the prosecution has to prove beyond a reasonable doubt, it doesn't say that the defense has no burden whatsoever regarding proving anything. I guess the problem I have is that if you couple that instruction with the instructions that were given on both substantive wire fraud and the conspiracy count, I don't see much room for confusion on the part of the jury that the intent to defraud was an element, that the burden was on the government to prove it beyond a reasonable doubt, notwithstanding a defense of diminished capacity. Well, Your Honor, you have to look beyond just the instructions. If there's a confusion, you have to look at the whole case itself. You have to look at the jury's question. You have to look at the trial. And in the trial, in his closing argument, in rebuttal, the U.S. attorney said, what is the most the defense has proven about Mr. Hawkins? Then he goes on to say, actually, I'm not going to say proven. What does the government accept? So he basically planted the seed in the jury that we have some kind of burden of proof. And taken together with the jury's questions, that does raise the issue. The court has a duty, if the defense contests an element, to fairly resolve a question in the instructions. And it's harmful error for them not to do it. And that's exactly what happened here. Thank you. Okay. Thank both sides for your arguments. The case of United States v. Hawkins and Skynes is now submitted for decision. That concludes our argument calendar for this morning. We will reconvene tomorrow at 930, although I suspect you nice people won't be here. Okay. And, Mr. Ratner, Mr. Morgan, nice to see you again. Ms. Royal, nice to meet you for the first time. It's been a long time since I've seen Mr. Ratner. All rise.
judges: O'scannlain, Fletcher, Tallman